UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION
------------------------------------------------------------

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )   Case No. CR 19-20
                                   )   Green Bay, Wisconsin
        vs.                        )
                                   )   July 8, 2019
MICHAEL J. PROPST,                 )   1:30 p.m.
                                   )
                    Defendant.     )

------------------------------------------------------------

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

For the Government:        United States Dept of Justice
                           (ED-WI)
                           By: DANIEL R. HUMBLE
                           Office of the US Attorney - 205
                           Doty St - Ste 301
                           Green Bay, WI 54301
                           Ph: 920-884-1066
                           Fax: 920-884-2997
                           Daniel.Humble@usdoj.gov

For the Defendant
MICHAEL J. PROPST:         Federal Defender Services of
(Present)                  Wisconsin Inc
                           By: THOMAS E. PHILLIP
                           801 E Walnut St - 2nd Fl
                           Green Bay, WI 54301
                           Ph: 920-430-9900
                           Fax: 920-430-9901
                           Tom_Phillip@fd.org

U.S. Probation Office:     BRIAN KOEHLER (920) 884-7785


U.S. Official Transcriber: JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:         WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.



1

```
                              I N D E X

WITNESS   EXAMINATION                                    PAGE

DIRECT TESTIMONIAL STATEMENT
```

```
      LAURA BESSON....................................    9
```

```
DIRECT TESTIMONIAL STATEMENT
```

```
      MICHELLE NELLIS.................................   10
```

```
MORGAN NELLIS, GOVERNMENT WITNESS
```

```
      DIRECT EXAMINATION BY MR. HUMBLE................   12

      CROSS-EXAMINATION BY MR. PHILLIP................   15
```

```
MASON NELLIS, GOVERNMENT WITNESS
```

```
      DIRECT EXAMINATION BY MR. HUMBLE................   18

      CROSS-EXAMINATION BY MR. PHILLIP................   22
```

```
ALLOCUTION
```

```
      BY THE DEFENDANT................................   33
```

```
                            *****
```

1          TRANSCRIPT OF PROCEEDINGS

2         Transcribed From Audio Recording

3                 *     *     *

4          THE COURT:  You may be seated.

5          THE CLERK:  Court calls Case No. 19-CR-20, *United*

6  *States of America vs. Michael J. Propst* for sentencing.  May I

7  have the appearances, please?

8          MR. HUMBLE:  Dan Humble for the Government.  Good

9  afternoon, Your Honor.

10          THE COURT:  Good afternoon.

11          MR. PHILLIP:  Good afternoon, Your Honor.  Mr. Propst

12  is here in person, along with Tom Phillip.

13          PROBATION OFFICER:  Good afternoon, Your Honor.  Brian

14  Koehler on behalf of Probation.

15          THE COURT:  All right.  Well, good afternoon, all.

16          Mr. Propst is before the Court today for a sentencing

17  on two counts of threatening interstate communications, in

18  violation of Title 18 U.S.C. § 875(c).  That offense carries a

19  maximum penalty of 5 years in prison and up to a $250,000 fine.

20          He also has a count of obscene or harassing telephone

21  call which carries up to 2 years in prison and a $250,000 fine.

22          The presentence report is on file.  I've also received

23  sentencing memorandums from both parties.

24          First of all, Mr. Humble, is the government in

25  agreement with the factual statements in the guideline

1  calculation that's recommended by probation?

2      MR. HUMBLE:  Yes.

3      THE COURT:  Mr. Phillip, you've gone over the

4  presentence report with your client, I take it?

5      MR. PHILLIP:  Yes.  Thank you.

6      THE COURT:  And I believe you state in the report you

7  have no objections to the factual statements or the guideline

8  calculation; is that right?

9      MR. PHILLIP:  None to the guidelines.  I did object to

10 two paragraphs in the report, paragraph 62 and 63.

11     THE COURT:  And your objection is that these are not

12 related conduct or relevant?

13     MR. PHILLIP:  That's one part of it, yes.

14     THE COURT:  Doesn't offer sufficient evidence that can

15 be used for character?

16     MR. PHILLIP:  Yes.  The objection there goes actually

17 hand in hand with an objection about the Crime Victims' Rights

18 Act.  And so if the Court prefers, I can argue them both

19 together or we can do that separate.

20     THE COURT:  Mr. Humble, do you regard the daughter of

21 MN as a victim who should -- who can address the Court or is

22 this evidence you are seeking to offer as to character?

23     MR. HUMBLE:  Your Honor, there's actually -- just to

24 let the Court know, another individual showed up today, Mason

25 Nellis.  And the daughter's name is Morgan Nellis.  They're here

1    today.  I don't consider them victims, I consider them people

2    who are familiar with the defendant, who I believe lived with

3    the defendant for quite a time, and they can speak to his

4    background and his character.

5              THE COURT:  So is it your intent then to offer

6    evidence in that form?

7              MR. HUMBLE:  They would like to address the Court,

8    yes.  And if --

9              THE COURT:  Well, I don't -- I think victims get to

10   address the Court.  You can present testimony --

11             MR. HUMBLE:  Sure.

12             THE COURT:  -- if it's relevant testimony at

13   sentencing.

14             And then, but they have to testify under oath subject

15   to cross-examination.  And wouldn't that then take care of your

16   complaint, Mr. Phillip, that there's no evidentiary basis?  I

17   mean, I can assess credibility like I would do in any case at

18   the sentencing.  Or --

19             MR. PHILLIP:  Well, yes and no.  I don't want this

20   sentencing hearing on telephone calls to become a miniature

21   trial on an alleged sexual assault from 2012.  I don't believe

22   that that would be relevant.  I also don't think there would be

23   any federal jurisdiction for that offense, and so this would be

24   the wrong forum to have that testimony.

25             There isn't any limitation under Section 3661 on

1    information the Court can receive about the background,

2    character, things like that.  So if anyone wants to give

3    information about what they think of the defendant's character,

4    I think that they can do.  But I think if we get to, again, any

5    specifics about an alleged sexual assault from 2012, I think

6    that that would have -- well, I think it would be the wrong

7    forum, I think it would be irrelevant, and I think that it would

8    be a due process problem to happen.

9              THE COURT:  Mr. Humble?

10             MR. HUMBLE:  Judge, I would just respond.  I think

11   there's a recognition by the parties here, certainly with the

12   plea agreement, that this is not a guidelines case.  And I'm

13   certainly asking -- the government is -- asking the Court to

14   kind of look at who this defendant is in a very serious way

15   since we're asking for a sentence much above the guidelines.

16   And I think that it's certainly acceptable for the Court to hear

17   this kind of evidence before it makes its decision.

18             THE COURT:  Yeah, I think -- I mean, I don't want to

19   turn it into a sexual assault trial.  It can't be turned in.

20   This is a sentencing hearing on very specific counts that I

21   mentioned earlier and that's what it will remain.  But the

22   defendant's character is an issue or a relevant concern.  People

23   that he lived with for a lengthy period of time may have

24   evidence that bears on that.  I recognize that it's dated at

25   this point.  On the other hand, the behavior that we're looking

6

1    on goes over a period of 20, 30 years.  We're not talking about

2    an incident that suddenly occurred and was isolated.

3          So I can't rule -- or I wouldn't rule I don't find it

4    irrelevant in the sense of inadmissible at a sentencing hearing.

5    Now, what weight I will give it, if any, that I will determine

6    after listening to it, watching the witnesses, hearing whatever

7    cross-examination there is.

8          But if the government wishes to introduce this

9    evidence as evidence at a sentencing hearing on character of the

10   defendant, I'll allow it.  Okay.  So is that where we end up?

11         First, I mean, I will recognize the objections to

12   62-63, paragraphs 62 and 63.  I'll adopt the other factual

13   statements in the presentence report as my findings of fact.

14   And am I correct, Mr. Phillip, the defense has no objection to

15   the remaining --

16         MR. PHILLIP:  No.

17         THE COURT:  -- statements?  And you're not objecting

18   to the guideline calculation either.

19         MR. PHILLIP:  No, the guidelines are correctly

20   calculated.

21         THE COURT:  Okay.  Very well.  Mr. Humble.

22         MR. HUMBLE:  Your Honor, the government filed its

23   sentencing memorandum.  I think we very forcefully are asking

24   this court to impose a 10-year sentence.

25         THE COURT:  Do you wish to introduce the character

1  evidence you're talking about?

2          MR. HUMBLE:  I will.  If I could have two other

3  individuals speak who I think Mr. Phillip recognizes are likely

4  victims here --

5          THE COURT:  Sure.

6          MR. HUMBLE:  -- and address the Court first, and then

7  I'll present the evidence.

8          THE COURT:  Okay.

9          MR. HUMBLE:  I would ask Loren Besson to address the

10  Court, Your Honor.  She is the mother of "Sammy" who was the

11  individual here in Green Bay noted in paragraph 15 who kind of

12  had the phone call that kind of kicked all this off with regard

13  to the defendant.

14          THE COURT:  Right.

15          MR. HUMBLE:  And I know she'd like to address the

16  Court.

17          THE COURT:  Okay.  Ms. Besson, would you please state

18  your full name and spell your first and last name.  And then go

19  ahead and make your statement.

20          MS. BESSON:  Laura Z. Besson, B-e-s-s-o-n.

21          THE COURT:  How do you spell Lauren?

22          MS. BESSON:  Laura, L-a-u-r-a.

23          THE COURT:  L-a-u-r-a?

24          MS. BESSON:  Yeah.

25          THE COURT:  Thank you.  Go ahead, Ms. Besson.

1          DIRECT TESTIMONIAL STATEMENT OF

2                    LAURA BESSON

3          MS. BESSON:  The day that this man called me he had me

4   believing that he was raping and killing my daughter.  It was

5   the worst horrifying thing that you can do to a mother.  It took

6   30 minutes to realize that he didn't have my child.  And he

7   called back several times, enjoying the terror that he put me

8   through.

9          And this has forever, ever changed my life.  I fear to

10  leave my kids alone outside.  They're not allowed to play with

11  neighbors anymore because I don't trust anybody.

12         I believe if you allow this man to get out, he is

13  going to rape and kill a child one day.  He's fantasizing about

14  it.  I mean, over and over.  This is not an isolated incident.

15  And I fear for my kids, I fear for other children, and I would

16  lock him up and throw away the key if I could.

17         That's pretty much all I've got to say.

18         THE COURT:  All right.  Thank you, Ms. Besson.

19         MR. HUMBLE:  Your Honor, I believe Michelle Nellis,

20  who is referred to in the sentencing memorandum and also in the

21  PSR, would like to address the Court.  She was the longtime

22  girlfriend of the defendant.

23         THE COURT:  Okay.  Now, is this the character evidence

24  that we're talking about that is not victim/witness?

25         MR. HUMBLE:  In my conversations with Mr. Phillip I

1  don't believe there's an objection to treating her as a victim.

2        MR. PHILLIP:  I agree.

3        THE COURT:  Okay.

4        MR. PHILLIP:  It's -- Morgan Nellis is the one that I

5  object to specifically.

6        THE COURT:  Okay.

7        MR. PHILLIP:  Michelle Nellis I believe would qualify.

8        THE COURT:  Ms. Nellis.

9                DIRECT TESTIMONIAL STATEMENT OF

10                      MICHELLE NELLIS

11       MS. NELLIS:  My name is Michelle Nellis.  I didn't

12 want to be here today.  But today I realized that I wouldn't

13 want a career as a judge or even be on a jury because I wouldn't

14 want to help in putting somebody in jail or decide their fate.

15       But as a citizen and as a mother, I know that I have

16 to be here.  I have to be here for my children, my daughter, and

17 for the children of society.  I've known Michael for 15 years.

18 We have a 10-year-old and a six-year-old.  I don't want my boys

19 to grow up like him.  I don't want them to be influenced by him.

20 Since he's been gone my boys are happy and they're doing well.

21       And I agree with the lady behind me, I know that one

22 day -- if it hasn't happened already -- that somebody's going to

23 get hurt.  He already hurt my daughter a couple times.  And we

24 were in a relationship.  He was supposed to be a stepfather, a

25 role model.

1       He's done this before.  He's been in prison before.

2   The judge prior said you do this again you're going away for 20

3   years.  He knew that.  He was given a second chance.

4       Despite everything, he can't control himself.  Really

5   bad things are going to happen.  I believe him being in prison

6   will protect us as a society, as a family, and it will protect

7   him.  He's his own worst enemy.

8       I'm not here for revenge.  I'm not being vindictive.

9   It's nothing like that.  I have to live with the guilt forever

10  for what he did to my daughter.  I didn't protect her.  And

11  she's such a good soul.  And she forgave him just so that we

12  could maybe carry on as a family.

13      I don't think he's sorry.  I think he'll do it again.

14  And I think it's going to be very bad.  I really do believe

15  that.  What are we waiting for?  Are we waiting for him to do

16  something?  He's not going to stop.  People don't change.  They

17  don't.

18      Thank you.

19      THE COURT:  Thank you, Ms. Nellis.

20      MR. HUMBLE:  Your Honor, at this time I'll offer that

21  character evidence and ask Morgan Nellis to come here and take

22  the stand.

23      THE COURT:  Ms. Nellis, please come forward and be

24  sworn.

25      THE CLERK:  Please raise your right hand.

11

1    Do you solemnly swear the testimony you are about to

2  give will be the truth, the whole truth and nothing but the

3  truth so help you God?

4    THE WITNESS:  I do.

5    THE COURT:  Please state your full name for the

6  record.  Please spell both your first and last names.

7    THE WITNESS:  My name is Morgan Nellis, M-o-r-g-a-n,

8  N-e-l-l-i-s.

9    THE COURT:  Thank you, Ms. Nellis.

10    Go ahead, Mr. Humble.

11    MR. HUMBLE:  Thank you, Your Honor.

12    MORGAN NELLIS, GOVERNMENT WITNESS, DULY SWORN

13    DIRECT EXAMINATION

14  BY MR. HUMBLE:

15  Q.  And how old are you, Ms. Nellis?

16  A.  I am 28 years old.

17  Q.  And are you familiar with Michael Propst?

18  A.  Yes, I am.

19  Q.  And how are you familiar with him?

20  A.  He started dating my mother when I was 14.  And they were

21  together till about five years ago.

22  Q.  So you lived with him for approximately 10 years, sounds

23  like, maybe a little longer?

24  A.  Yes.  On and off.

25  Q.  Do you feel that you lived with Mr. Propst long enough to

1  kind of develop an idea about his character and his behavior?

2  A.  Yes, I do.

3  Q.  And how would you classify for the Court Mr. Propst's

4  character?

5  A.  I think he is a very sick and evil individual.

6  Q.  And what brought you to that conclusion?  Why do you say

7  that here today?

8  A.  This is a man who has outright said that he thinks that it's

9  human nature to want to engage in sexual acts with children, and

10  that that's just how it is, and that women of society have made

11  that a vile act.

12  Q.  Just to provide some context for the Court, you've overheard

13  the defendant say that once, twice, how many times?

14  A.  Only once that I have overheard it.

15  Q.  What was the situation or the context that that occurred?

16  A.  He was having a conversation with my mother when, after she

17  had found some inappropriate photos of children on his phone in

18  underwear and a state of undress, that -- and when confronted

19  with it he said that that was natural and that that's what all

20  men wanted and that women have made it wrong to want that, but

21  that it's natural.

22  Q.  Is there anything else during the time that you've known

23  Mr. Propst or lived with Mr. Propst that helped you develop an

24  idea about his character?

25  A.  He -- sorry.  After my son was born I was sleeping when I

13

1    was living with my mom and him with my son in our room, and when

2    I woke up he had his hands on me, on my genitals.  And that's

3    what I woke up to and it was terrifying for me.

4           And I didn't know how to react.  And I was just

5    worried about my son at the time because he was in the room with

6    me.  And I was afraid that he would hurt me if I tried to fight

7    him.  And I just kind of talked him out of trying to do more

8    than that at the time.

9    Q.  How old were you at this time?  Do you recall?

10   A.  19, I believe, or 20.

11   Q.  Is that -- was that a one-time occurrence?  Did anything

12   like this happen any other time?

13   A.  When I was a teenager about 14 or 15, there was times -- and

14   he didn't assault me or anything at that time, but he would kind

15   of lean in for a kiss and stuff like that.  And I would just

16   leave at the time.  And I thought maybe I was just perceiving a

17   fatherly-type-meant action incorrectly and that I was maybe just

18   uncomfortable with it so I would leave.  But in hindsight,

19   looking back, there was -- there was nothing fatherly about him,

20   ever.

21   Q.  Based on what you've come to know about Mr. Propst and his

22   character, do you have concerns about Mr. Propst?

23   A.  Absolutely.

24   Q.  And --

25          MR. PHILLIP:  I'm going to object to this, Your Honor.

1    This is speculative and it's I think going beyond character and

2    information.

3              THE COURT:  Sustained.

4    BY MR. HUMBLE:

5    Q.  Is there anything else that you would like to tell the Court

6    with regard to Mr. Propst's character before you step down

7    today?

8    A.  Just that I know this is someone who shows no remorse for

9    anything that they've ever done wrong and, honestly, I don't

10   think thinks they ever have done anything wrong.  And that's

11   probably my biggest fear with someone who doesn't recognize the

12   things that they are doing wrong, they're going to keep doing

13   it.  And I do think it's a safety issue for the children in

14   society to have someone like that around.

15             MR. HUMBLE:  I don't have any other questions.  I

16   think Mr. Phillip may have some for you.

17             THE COURT:  Mr. Phillip?

18                       CROSS-EXAMINATION

19   BY MR. PHILLIP:

20   Q.  Your testimony was that Mr. Propst lived with you on and

21   off.

22   A.  Yes.

23   Q.  Do you know what years that would have been?

24   A.  2008.  After I had graduated I had moved out for about a

25   year, before moving up to Green Bay to stay with them again.

1    And then 2012, after that incident, I went to a shelter in town.

2    Other than that, I was with him and my mom for most of it.

3    Q.   You testified that you overheard Mr. Propst say something

4    about sexual acts with children being okay.

5    A.   Yes.

6    Q.   When would that have been?

7    A.   That was 2014, I believe.

8    Q.   So you're not sure.

9    A.   It was -- hold on.  Yes, 2014, April.  Because in March he

10   had made other lewd phone calls and that's when mom had actually

11   found out the context of his original conviction.

12   Q.   So that comment would have been about five years ago then?

13   A.   Yes.

14   Q.   Now, you testified about Mr. Propst allegedly putting his

15   hands on you.  When would that have been?

16   A.   2012.

17   Q.   And did you report that to law enforcement?

18   A.   I did not.

19   Q.   And you testified that at some point, I think the way you

20   put it was he would lean in for a kiss, but you used the word

21   then in hindsight that wasn't it.  Am I characterizing your

22   testimony accurately?

23   A.   I had said that I thought it was a fatherly act, and in

24   hindsight it wasn't it, in reference to it being a fatherly --

25   Q.   Right.  And hindsight's always 20/20, right?

1    A.   Yes.

2    Q.   And hindsight from today means that you already know all of

3    this prosecution and the history and why we're here, right?

4    A.   Yes.

5    Q.   And that colors your ideas of what might have happened in

6    the past.

7    A.   In reference to the kiss thing?

8    Q.   Yes.

9    A.   Yes.

10            MR. PHILLIP:  I don't have anything else, Your Honor.

11            THE COURT:  All right.  Anything else?

12            MR. HUMBLE:  No, Your Honor.

13            THE COURT:  Thank you, Ms. Nellis.  You may step down.

14            THE WITNESS:  Thank you.

15            (Witness excused at 1:53 p.m.)

16            MR. HUMBLE:  May I just check with Mr. Nellis if he

17    still wishes to --

18            THE COURT:  Sure.

19            MR. HUMBLE:  Government would call Morgan -- or excuse

20    me, Mason Nellis.

21            THE CLERK:  Do you solemnly swear the testimony you

22    are about to give will be the truth, the whole truth and nothing

23    but the truth so help you God?

24            THE WITNESS:  I do.

25            THE CLERK:  Please be seated.  Please state your full

1  name for the record.

2          THE WITNESS:  Mason Nellis.  That's M-a-s-o-n,

3  N-e-l-l-i-s.

4          THE COURT:  Thank you, Mr. Nellis.

5          Go ahead, Mr. Humble.

6        MASON NELLIS, GOVERNMENT WITNESS, DULY SWORN

7                    DIRECT EXAMINATION

8  BY MR. HUMBLE:

9  Q.  Mr. Nellis, just so we understand, Michelle Nellis is your

10 mother?

11 A.  Yes, sir.

12 Q.  And Morgan Nellis who just testified is your sister?

13 A.  Yes, sir.

14 Q.  And how old are you?

15 A.  29.

16 Q.  And are you familiar with Mr. Propst?

17 A.  I am.

18 Q.  Did you live with him for any amount of time?

19 A.  Yeah, for a few years.

20 Q.  When approximately would that have been?

21 A.  I would say from like '06 to '08.

22 Q.  And have you been around him in addition to the times that

23 you lived with him?

24 A.  Yeah, plenty.

25 Q.  Do you feel that you are familiar enough with Mr. Propst to

1   offer your view of his character to the Court?

2   A.   Absolutely.

3   Q.   How would you describe Mr. Propst's character?

4   A.   I would just like look at it as a face value, the man's a

5   terrorist.  He terrorizes people.  He gets off on that.  And

6   it's really only a matter of time before he acts out on these

7   things if he hasn't already.

8   Q.   And let me --

9            MR. PHILLIP:  I'm going to object to that answer,

10  Your Honor.  Again, it's speculative both future wise and past.

11           THE COURT:  Okay.  I'll sustain the objection.

12           Mr. Nellis, and this is not to criticize you or to --

13  just listen closely to Mr. Humble's question.

14           THE WITNESS:  Okay.

15           THE COURT:  And just answer that.

16           THE WITNESS:  Do you want to repeat it?

17           THE COURT:  No, he'll have another question for you.

18  Thanks.

19           THE WITNESS:  Yeah.

20           MR. HUMBLE:  "Sustained" means don't.

21  BY MR. HUMBLE:

22  Q.   If I could just uncompact one portion of that.

23  A.   Okay.

24  Q.   You said the word "terrorist."  That's a very loaded term.

25  A.   Okay.

1    Q.   Is there something based on what you -- your interactions

2    with Mr. Propst or what you know of Mr. Propst, irrespective of

3    these charges, that makes you say that?

4    A.   Irrespective?

5    Q.   Yeah.  So put what you know about these phone calls to the

6    side.  Is there something about what you've observed or heard

7    from Mr. Propst that makes you use that word terrorist?

8    A.   Yeah, absolutely.

9    Q.   And what is that?

10   A.   He terrorizes anybody.  Even a stranger in a grocery store,

11   if they were in his way he would cuss them out.

12   Q.   You've seen this?

13   A.   Yeah, absolutely I have.  Things of that nature, yes.  Other

14   drivers on the road, road rage like crazy.  Calling my family

15   all types of names and threatening them.  Even our dog was

16   scared of him, petrified.  We had to get rid of it because it

17   would just hide under the bed any time he was under the house

18   because he was abusive.

19   Q.   Were you afraid of Mr. Propst?

20   A.   Not so much.

21   Q.   And why is that?

22   A.   I was afraid for my family because of him, but I just -- you

23   know, he never threatened me personally and I'm just not scared

24   of him like personally.

25   Q.   Okay.

1  A.  But I was worried about my family's well-being and anybody

2  else's, yeah, absolutely.

3  Q.  Have you observed actions or words of Mr. Propst's

4  conversation, been involved in conversations with Mr. Propst and

5  your mother that caused you concern about his character?

6  A.  Can you repeat that, please?

7  Q.  Sure.  Have you observed anything or overheard conversations

8  between Mr. Propst and your mother that caused you any concern?

9  A.  Oh, absolutely.

10  Q.  And what types of things were those?

11  A.  One time -- one example I can think of is they were having

12  some sort of argument, and he didn't think that I heard this but

13  he said, "If you do this, I am going to fucking kill you" is

14  what he said.

15  Q.  Did you take him seriously?

16  A.  Oh, yeah.  You could hear it in his voice.  Yeah,

17  absolutely.  He was serious, yes.

18  Q.  With regard to -- did you ever observe -- let me rephrase

19  that.  Did you ever observe any conversations or actions between

20  Mr. Propst and your sister that caused you concern?

21  A.  Not really.  I mean, yes, I have.  I guess like he would

22  call her names and he would constantly like tell her to like she

23  needs to do this or -- and then -- like you need to get a job.

24  And then he would be like, well, you need to quit that job and

25  he'd kick her out -- try to kick her out of the house and things

1    like that.  And just call her names, things of that nature,

2    yeah.  I never seen him do anything like physically

3    inappropriate to her.

4    Q.  So it sounds like with regard to character you'd describe

5    him as controlling; is that fair to say?

6    A.  Oh, yeah, absolutely.

7    Q.  And before I end the questioning here, is there anything

8    else with -- just with regard to Mr. Propst's character that you

9    wish to convey to the Court, based on what you know about him?

10   A.  No.  No.

11              MR. HUMBLE:  Okay.  Thank you.

12              THE COURT:  Okay.  Thank you, Mr. Nellis.

13              MR. HUMBLE:  Oh, just --

14              THE COURT:  Wait a minute.  Wait a minute.

15   Mr. Phillip has a couple questions.

16              MR. PHILLIP:  Probably just two.

17                        CROSS-EXAMINATION

18   BY MR. PHILLIP:

19   Q.  So, the time that you lived actually with Mr. Propst in the

20   same residence was approximately 2006 to 2008?

21   A.  You know, it might have been '05 to '08-ish, approximately,

22   yeah.

23   Q.  Okay.  So more than 10 years ago.

24   A.  Sure.

25   Q.  And some of the other questions were general.  I'll finish

1  with a general question.  You don't like him much, do you?

2  A.  It's definitely not a personal thing, no.

3          MR. PHILLIP:  Okay, thank you.  That's all.

4          THE COURT:  Thanks, Mr. Nellis.  You can step down

5  now.

6          (Witness excused at 1:59 p.m.)

7          MR. HUMBLE:  Your Honor, I'm not going to present any

8  more testimony or statements.

9          I would just, to sum up, say I think a 10-year

10 sentence here serves a lot of purposes that I put in the

11 sentencing memorandum.  I think he is -- Mr. Propst has

12 demonstrated over that 20-year span that the government talked

13 about just an unwillingness to conform his behavior.  And I

14 think, frankly, the big sign is back in 2002 when he received

15 that 41-month federal prison sentence following his state

16 convictions, I would have thought or one would think that would

17 have been the moment where this all stopped.  But I think it's

18 been shown that it has not.  And it's essentially almost word

19 for word the same exact behavior over a 20-year span which

20 should cause this court concern.

21          Obviously you've heard a lot here about his character

22 from the people who know him best, which I think would cause the

23 Court some concern here.  I don't very lightly say lock somebody

24 up just for 10 years to protect the community, and frankly I'm

25 not sure I have made that argument very often in this court.

23

1  But I do believe with regard to Mr. Propst there is a real

2  purpose here of deterrence in the form of incarcerating him so

3  this does not happen to another Ms. Besson or any number of the

4  people in 15 states that this has occurred to over the 20 years,

5  Your Honor.

6          THE COURT:  Okay.  Thank you, Mr. Humble.

7          Mr. Phillip?

8          MR. PHILLIP:  Thank you.

9          I'll start at the beginning.  Not the beginning of

10  Mr. Propst's life or the beginning of the case, I'll start at

11  the beginning of the hearing today.  And I will start off by

12  saying that aside from the written arguments in the sentencing

13  memorandum, the government's presentation today focuses on

14  information from the two witnesses that testified from between

15  five and ten years ago.

16          And the government's presentation and its argument

17  today, the government covers the case itself in the sentencing

18  memorandum, so that's in front of the court as well, but the

19  presentation today seems to be based on historical information,

20  not charged, not referred for charges, not reported for charges

21  at the time, and information given in hindsight.

22          I think -- well, I don't think -- I know that the

23  Court obviously can take anything into consideration at

24  sentencing under 3661 and decide which -- excuse me, how much

25  weight to put on any information presented to it.  And so my

1   argument regarding that historical information would be that the

2   Court should put little or no weight on it.

3          The Court has already addressed the objections.  I

4   won't repeat those, but I'll simply repeat the argument that I

5   think it's, as its character evidence, as the Court has ruled

6   it's admissible, but I don't think that there's much weight to

7   put on it.  I don't know that it's necessarily accurate.  It's

8   old and, again, it's colored by hindsight.  And while the Court

9   can listen to it, I don't think that it's that relevant to the

10  charges that are in front of the Court right now.

11         So, moving onto the sentencing arguments about the

12  case itself.  The nature and circumstances of this case are

13  phone calls.  And not all the calls are the same.  Some of the

14  calls were sexual in nature, some were harassing.  Some calls

15  weren't connected, some Mr. Propst would hang up.  In other

16  words, he would chicken out if someone answered.  And some of

17  the calls weren't believed.

18         One recipient of a call, this -- as a former report in

19  discovery was the basis of actually at least one of the charges

20  that were dismissed, the recipient of that call candidly said

21  she didn't believe Mr. Propst about what he was saying.  She

22  still reported it and still gave a report to the FBI about it

23  and talked about the contents of the call, but said she didn't

24  believe what he was saying.

25         So not all these calls were the same.  The majority of

25

1    the calls were to people in other states.  The Court heard today

2    from Ms. Besson who -- that call was not made to another state,

3    that call was made within Green Bay.  But the counts of

4    conviction were calls from Wisconsin to Indiana and there were

5    no actual children involved and no ability to carry out any of

6    the things that Mr. Propst would say.

7          The calls coincide I think strongly with Mr. Propst's

8    drug abuse, particularly with methamphetamine.  And that is

9    fairly easy to confirm both by common sense and by information

10   in the presentence report.  The day of the calls of conviction

11   is June 12, 2018.  Paragraph 83 of the report details

12   Mr. Propst's arrest on that day where he was found with

13   methamphetamine, was arrested, convicted of that possession of

14   methamphetamine and served a term in the Brown County Jail.

15         The presentence report is long and detailed.  This

16   presentence report is even longer than many.  Part of that is

17   based on Mr. Propst's criminal history, part of that is based

18   that he's 46 years old and has a longer life history than

19   someone who is 20 years old.  It goes through his own family

20   history, details what I would call a broken home with some

21   abuse.  There's an early start for Mr. Propst to both using

22   drugs and an early start to sexuality.

23         I think it's fair to say that the beginning of his

24   life didn't start out smoothly.  He began driving a truck as his

25   career.  He began that pretty early.  He's done that for his

26

1    whole life.  He's not married.  As the Court has read and has

2    heard he does have two children, they're ages 10 and 6.  He

3    wants to be a part of their lives.  He's not sure, I'm not sure,

4    perhaps nobody is sure how that might work out in the future.

5          His criminal history category is IV.  He has relevant

6    convictions for methamphetamine and for similar calls.  So those

7    convictions in 1999, those start in Florida.  Those were at

8    paragraph 65 through 77 of the presentence report.  And though

9    that takes up any number of pages and the dozen paragraphs,

10   those convictions were resolved together essentially at the same

11   time.

12         The calls in those convictions span mostly over a time

13   period of a month.  About nine charges from two days, and four

14   or five others from a few other days.  They were all resolved in

15   July I think it was of 1999, with a four-month jail term and

16   later an eight-month term on revocation.

17         Then, the other prior conviction that's relevant is

18   2002, in the Middle District of Florida.  That sentence was 41

19   months in the Bureau of Prisons.  And he successfully discharged

20   from his term of supervised release.  And paragraph 78 notes

21   that he had positive adjustment on supervision with no

22   violations.

23         After that, after 2002, there's a fairly long period

24   without much else.  There's a disorderly conduct in 2010, and a

25   possession of marijuana in 2014.  So that brings us up to the

27

1  convictions and the events bringing us here today.

2          So if we look at the Guideline Manual, the range comes

3  up to be 24 to 30 months.  And the Guideline Manual is supposed

4  to at least take everything into consideration about a case:

5  The specific defense characteristics, the defendant's criminal

6  history, the number of counts, the number of calls.

7          And so, again, using the manual, there would be at

8  least a presumptively reasonable sentence of 24 to 30 months.

9  But no one's recommending the guideline range.  Our request,

10  frankly, is double the top end of the guideline range.  Our

11  request is 60 months.

12          And there's lots of reasons to recommend 60 months,

13  five years, that recognizes Mr. Propst's priors, recognizes the

14  repetitive nature of his priors, and then recognizes, maybe

15  better than the guidelines do, that people received these calls.

16  The guidelines can be dry, they can be mechanical I've argued in

17  other contexts.  And so the recommendation for a sentence of

18  twice the range I think recognizes better that people got these

19  calls and people were scared and frightened about that.

20          All of this is by telephone.  So there's no actual

21  contact.  And it is scary, it is frightening, it's

22  reprehensible, but none of the things that Mr. Propst said

23  actually took place.  Again, he was states away in charged

24  counts and miles away in others.

25          The Court is often faced with situations where victims

28

1   or witnesses want the Court to sentence as if other events

2   actually took place. Sometimes arguments are made that the

3   Court should sentence for things that might happen in the

4   future. The Guideline Manual, again, with the facts of the case

5   and the defendant's record and adding levels for grouping,

6   suggests 24 to 30 months. But, again, our recommendation is

7   double that, of 60 months.

8           It would be foolish I think for me to recommend 24

9   months. I don't think that would recognize the seriousness of

10   the offense. But I also think it's possible to overstate the

11   offense.

12           There are the concepts in sentencing of

13   proportionality or marginal deterrence. And I think the

14   government's recommendation of four times the guideline range

15   and twice ours, the government's recommending 10 years, I think

16   that recommendation overstates the offense and I think that it

17   runs into the problem of marginal deterrence which is, in short,

18   if the harshest sentence is given out for something that's not

19   the worst offense, what do you do next time, not necessarily to

20   this defendant, but to a different defendant.

21           I would argue that the 60-month sentence promotes

22   respect for the law. It's a five-year sentence for these calls

23   and five years is a long sentence. It's not a slap on the

24   wrist, it's not a break, it's not a concession. It's a long

25   sentence.

1         Some number of the people that spoke, and I respect

2 their ability to speak and their opinions of what the Court

3 should do, but the Court can't lock up Mr. Propst forever. The

4 maximum possible sentence here is 12 years. No one's asking for

5 that.

6         The sentence, as the Court is obviously aware, is to

7 promote respect for the law, to address the seriousness of the

8 offense. It's also supposed to deter both the defendant and

9 other people. So in terms of specific deterrence, this is a

10 longer sentence than any prior term for Mr. Propst. It is

11 graduated punishment, it incrementally goes up, it gets more

12 serious every time. So that deters Mr. Propst. And it can

13 deter others to the extent that others hear about it. It shows

14 that phone calls, even phone calls are dealt with harshly,

15 particularly when they have the subjects and the effect that

16 they do here.

17         I would argue that 60 months protects the public in

18 really two ways. And I argue that it protects the public

19 because it's connected to the provision of treatment.

20         So the first part of treatment that Mr. Propst needs

21 would be the Bureau of Prisons Residential Drug Abuse Program.

22 And furthermore, the Bureau of Prisons would also offer sex

23 offender treatment for Mr. Propst. Both of those would start

24 off as inpatient in the Bureau of Prisons, and then both would

25 be continued on an outpatient basis through supervision.

1    So the presentence report notes that Mr. Propst spoke

2  candidly in the interview about the offense and about his need

3  for treatment.  He mentions that Mr. Propst suggested what he

4  called "empathy treatment."  And that's not just a buzzword.

5  Empathy treatment, what that means is trying to put yourself in

6  somebody else's shoes.  And I think Mr. Propst realizes that he

7  needs that in order to stop making calls.

8    And I would gently disagree with at least one person

9  that spoke saying people don't change.  People do.  People can

10  change.  People can become different than they were before.

11  That may be hard to believe, it may be something that someone

12  doesn't want to believe, but it is possible.  We see people come

13  through this courtroom through our own lives that do change over

14  time.  And so it is possible for Mr. Propst to become a better

15  person.

16    There's a small step that he took.  This is not

17  something that the Court ordered, it's not something Mr. Koehler

18  from probation suggested, it's not even something I suggested.

19  He wrote apology letters on his own.  He gave those to me and I

20  can give them to the probation office so they can review them

21  and see if they're acceptable to send out to the people

22  involved.  That's something that he did on his own and that's

23  something that he feels is important.  And that's something that

24  I think is at least a start of some sort of empathy treatment on

25  his own.

1      Then, although this may seem obvious too, but he

2 obviously needs drug abuse treatment because the calls and the

3 use of methamphetamine really goes hand in hand.

4      So between a five-year sentence within the Bureau of

5 Prisons and three years on supervision, that's eight years for

6 treatment and protection of the public.  And that obviously

7 could be longer if Mr. Propst relapses either in making calls or

8 in using drugs, probation can -- or, excuse me, supervision can

9 be extended.

10      As I mentioned in my sentencing memo, as a society we

11 can't lock up everybody for everything forever.  There is a

12 consideration in both Congress when they write the statutes and

13 set the penalties, and then the court when it makes sentencing

14 decisions, there's a consideration about proportionality.

15      And then I think there's also some consideration to be

16 given, I would characterize it as level of trust that the Bureau

17 of Prisons and the probation office will both treat and monitor

18 Mr. Propst.  It's not as if when Mr. Propst finishes his term of

19 imprisonment, whatever the Court sets, it's not as if he's

20 released to the wild.  The probation office has a great deal of

21 resources, they have a good number of people, and they take

22 their position in supervision very, very seriously.  And the

23 conditions of supervision that are proposed as part of the

24 presentence report I think do address a lot of the

25 considerations that not only the people who spoke have, but the

32

1    people in court, the parties have, and certainly the Court has

2    in order to keep the community safe.

3            In many, if not most cases, the driving factor in

4    determining a sentence is punishment, what punishment is

5    sufficient but not greater than necessary.  I would argue that

6    60 months is punishment, that it is a long sentence for these

7    particular crimes, the ones he stands convicted of.  It is a

8    long sentence for this defendant.  It's longer than his prior

9    sentences.  And with supervision, the term of incarceration and

10   the term of supervision does what we want a sentence to do.

11           So I would ask that the Court impose a sentence of

12   5 years, that is, 60 months, the 3 years of supervision.

13           I would ask that the Court decline to impose a fine

14   because Mr. Propst does not have the ability to pay.

15           I'd ask that the judgment include recommendations for

16   the Residential Drug Abuse Program, for sex offender treatment,

17   for placement at Oxford or closest to Green Bay as possible.

18           Your Honor, I believe that Mr. Propst has prepared a

19   short statement.  If the Court is ready for that, he's prepared

20   to read that.

21           THE COURT:  Yes.  Thank you, Mr. Phillip.

22           Mr. Propst, is there anything you would like to say

23   before I make a decision?

24           THE DEFENDANT:  Yes, Your Honor.  Thank you.

25                         ALLOCUTION

1  BY THE DEFENDANT:

2          My name is Michael Propst.  I am the person who made

3  these terrible phone calls to people claiming I had found a

4  child that was lost when, in fact, I had not; and, in some of

5  those calls, claimed that I was sexually abusing them.  I accept

6  responsibility for making these phone calls and I humbly offer

7  my sincerest apologies to the Court and to each and every one of

8  the victims of my crime, especially Ms. Besson, for having to

9  endure them.

10          I have also written individual letters of apology to

11  each victim I found in the discovery and have given these to my

12  attorney.

13          Though I know my words of apology now can never fully

14  take back the terrible words I said to people that I called, I

15  do truly regret every call of this nature I ever made more than

16  anything in my life.  I pray that some day all these people will

17  be able to forgive me for acting out on my sickness while I'm

18  not in my right mind, for I would never actually harm a child in

19  that way, or any way, and I never have.

20          I myself am a father of two young children whom I love

21  more than life itself.  And in hindsight, I can imagine the

22  fear, anger, even hatred I would feel if someone called me up

23  saying such things to me.  But in my emotionally-numbed

24  meth-induced frenzies, I would reason that because the whole

25  scenario was made-up and not real, that I wasn't really harming

1   anyone.  Failing to see in those moments that frightening these
2   people with these sick lies was harming them.  Maybe not
3   physically, but certainly mentally and emotionally.
4           If I could take them all back, I would, in a
5   heartbeat.  I don't ever want to do this again to anyone.  I
6   want help and I want treatment.
7           Therefore, while in prison I will volunteer for sex
8   offender treatment if they give it to me, and drug abuse
9   treatment.  And upon my release from prison I will continue sex
10  offender and drug abuse treatment while on supervised release
11  and abstain from my drug use and, therefore, any further deviant
12  behavior.
13          I will also reacquire employment as a commercial truck
14  driver and pay off all child support arrears.  And, if I am
15  permitted, I would very much like to reassume my place as dad in
16  my sons' lives with the time I have left in this world.
17          And with that final thought, I beg the mercy of the
18  Court.  Thank you, Your Honor.
19          THE COURT:  Okay.  Thank you, Mr. Propst.
20          Mr. Humble, how many calls of the nature in the Besson
21  case are part of the relevant conduct as opposed to the past
22  record in this case?  That's what I'm looking at.
23          MR. HUMBLE:  I'm sorry, Your Honor.  Could you say
24  that again?
25          THE COURT:  How many calls are relevant conduct to

1    this -- the charges in this case as opposed to past?  I think

2    you mentioned 41 calls in your memorandum, is that --

3              MR. HUMBLE:  41 convictions for calls.

4              THE COURT:  41 convictions for calls over the period

5    of his record.  But in this particular case, this would be,

6    Mr. Koehler, paragraphs really 21 through --

7              MR. PHILLIP:  One answer to your question, Your Honor,

8    is in -- I'm looking for it -- the number 105 sticks in my head.

9    If I can just find that paragraph.

10             PROBATION OFFICER:  20.

11             THE COURT:  Which paragraph?

12             MR. PHILLIP:  Paragraph 20.

13             PROBATION OFFICER:  20.

14             THE COURT:  20.

15             MR. PHILLIP:  And that's -- those are calls made on

16   June 12th, and so that's the -- what I'm going to call the date

17   of offense.

18             THE COURT:  Uh-huh.

19             MR. PHILLIP:  Those are the dates of the charges and

20   the convicted charges.

21             And a more general answer to the Court's question is,

22   I'll candidly say, I don't know because the discovery had a

23   large amount of phone records, a lot of which were duplicates,

24   and it's just a list of phone calls.  And so you're not

25   necessarily sure what those calls are.  I wouldn't be prepared

1  to agree and perhaps the government wouldn't be prepared to

2  argue that all of them were --

3          THE COURT:  Yeah.

4          MR. PHILLIP:  -- calls of this nature so....

5          THE COURT:  But paragraphs, really 21 -- I mean, the

6  Besson is the -- call is what precipitates things.  But as I

7  read this, the reports that document the nature of the calls and

8  provide the description of what was said is paragraphs 21

9  through --

10          Mr. Koehler, are these all up to paragraph 31?

11          PROBATION OFFICER:  Yes, Your Honor.  The conduct from

12  June 12 is kind of encapsulated between paragraphs 21 and 26.

13  And then it was through a further investigation they discovered

14  the conduct in Delaware, which is kind of outlined between

15  paragraphs 27 and 32.

16          THE COURT:  And that's all relevant conduct, correct,

17  because this is -- he's not being prosecuted in Delaware.

18          PROBATION OFFICER:  Yes.

19          THE COURT:  So the events of the June 12th, 105 calls,

20  but we have how many actually -- I mean, those are the calls

21  that are described to -- in addition to the -- is that -- I

22  mean, the Bessons, then Mercy Child Care in Iowa, Bright

23  Beginners Academy Child Care and Preschool in Indiana, Community

24  United Child Care in Iowa, Building Blocks Day Care Center in

25  Indiana.

1      Then additional calls on that day, obscene or

2 harassing nature to a hair salon in Orlando, grocery store in

3 Leesburg, college librarian in Duluth, daycare center in

4 Portland, Oregon.  We don't have reports concerning what was

5 said there.  At least that's not part of the presentence report.

6 Were those similar?  Were those claiming to have -- be sexually

7 assaulting children?

8      PROBATION OFFICER:  That I do not know, Your Honor.

9      THE COURT:  We don't know.

10      PROBATION OFFICER:  Correct.

11      THE COURT:  That's not part of the discovery.  But

12 then --

13      MR. PHILLIP:  There is some discovery, Your Honor,

14 about some of the other calls that were made to other

15 jurisdictions and that was part of my argument to the extent

16 that some of the calls were sexual, some were harassing, some

17 were a call, a hang-up, a callback, a hang-up.

18      THE COURT:  But these that I've described to the

19 daycare centers were calls where he's describing active sexual

20 abuse of children and acting it out on the phone.

21      MR. HUMBLE:  Correct.  However, I will point out what

22 Mr. Phillip did, that at least on one occasion the individual

23 did not believe that that was actually occurring.

24      THE COURT:  Right.  Then there's -- to go on, then

25 there's the daycare center in San Pedro, California.

38

1      And then we get, beginning at 28, the calls made from

2  Delaware.  And on November 13th, 2017 -- and there you have the

3  Tender Loving Kare childcare facility in Middleton, Delaware.

4      Then Bethel Christian School and Preschool in Lewes,

5  Delaware.  These were not claims of sexual abuse, though, these

6  were "I picked up lost children;" is that right?

7      MR. HUMBLE:  That's correct.

8      THE COURT:  Kids Cottage Daycare in --

9      The restaurant in Burlington where he claims he was

10  sexually abusing a child.  In Tennessee it looks like.  Okay.

11  All right.

12      Well, in arriving at a sentence I am to consider, of

13  course, the guidelines here which, as the parties agree,

14  understate the seriousness of the offense or the -- and the

15  history and character so as to understate a recommended

16  sentence.  The parties agree that, at least pursuant to the plea

17  agreement, that the guideline range of 24 to 30 months is

18  inadequate.

19      With respect to the other aspect, though, I must

20  consider the guidelines, but then I must consider the nature and

21  circumstances of the offense, the history and character of the

22  defendant, and then fashion a sentence which meets those goals

23  of, first of all, imposing just punishment for the offense, but,

24  secondly, deterring -- providing deterrence to the defendant and

25  others, also protecting the public from further crimes of the

39

1    defendant, and then providing opportunities for rehabilitation.

2         Looking first at the nature and circumstances of the

3    offense, I think these offenses are very serious.  I don't think

4    the guidelines certainly capture the calls to a mother, to a

5    family, to a childcare center where someone is -- enacts the

6    sexual abuse, ongoing sexual abuse of a child and tries to

7    convince them that they're -- that a child's being abused in

8    this fashion.

9         I think Ms. Besson described the impact upon her,

10   which is very understandable.  This is just not a nuisance call,

11   an obscene call.  The person that didn't believe it, to him it

12   probably was that, but that's because the person didn't believe

13   some -- it could happen.  But others who bought into it, and it

14   sounds like Mr. Propst was very good at acting this out, he

15   convinced a lot of people, they were terrified.

16        So these aren't nuisance calls, these aren't harassing

17   calls, these are -- I think Mr. Nellis isn't far off when he

18   describes them as terrorism.  Not mass terrorism, but he's

19   terrifying -- he's terrifying someone.  And that's his intent,

20   in such a horrible way.

21        So I think when I look at the history here and having

22   done this and received prison sentences for it and jail

23   sentences for it and then continuing to do that, I think we're

24   looking at a very serious offense.  It's not just one either.

25   This is not one thing he did to one person, this is something

1    and often multiple calls he made to these different childcare

2    centers over a period of time, many on one day, others on

3    another day.  So I think the offenses are very serious.

4            Now, the history and character of the defendant.  And

5    here, of course, we have multiple times when the defendant did

6    the same thing.  His criminal history record is I believe we

7    said a IV.  Frankly, it's kind of happenstance because I think,

8    you know, he could have been charged multiple times, had

9    multiple sentences for these that are separate and distinct

10   crimes and his criminal history category would be higher.  But

11   still, even a VI with a 13 doesn't bring us up to the -- even

12   the five-year sentence that's being recommended at the low end

13   here.

14           The character of the defendant.  You know, we heard

15   character evidence, but really the nature and number of these

16   offenses provide strong evidence of a very poor character, a

17   very dangerous character.

18           The argument that he is likely to harm children in the

19   future.  I am not good at predicting the future.  I agree that

20   people change.  Often though the best evidence of what they will

21   do in the future is what they have done in the past, especially

22   if it's of a long duration.  And here we have misconduct going

23   over a number of years.  The explanation that it's just drugs

24   that make me do it or it coincides with my drug use, it does

25   coincide with the drug use, but I don't believe it's drugs that

1   make Mr. Propst engage in this behavior.  It seems to me he

2   engages in the behavior and uses drugs while doing it perhaps to

3   make it easier for him to do it.  I don't explain this -- or I

4   don't have any illusion I think that merely providing him drug

5   treatment would be enough to counter this.

6          His allocution and his remorse today is not all that

7   credible given the history here.  Had he not been doing these

8   things or had a history of doing these things, it perhaps would

9   be more credible, but it's far less credible today.

10         So I think that I've certainly considered the

11  testimony of Ms. Nellis, Morgan Nellis and Mark Nellis, but it

12  is dated and I find Ms. Morgan Nellis credible.  I think it's

13  clear that these are painful things.  Mr. Philip talked about

14  hindsight coloring her view, but I think hindsight often

15  enlightens us to events that occurred before rather than

16  coloring them so much.

17         And so I'm satisfied that there was a history there.

18  That doesn't tell me, though, about the type of behavior we're

19  looking at here.  And I'm -- I don't find evidence that he's had

20  contact with children.

21         The expression, though, described in the presentence

22  report at paragraph 117, I believe recounted by both Ms. Nellis

23  and her daughter that the defendant saying that sexual

24  infatuation for minor children, stating it's natural for men to

25  be attracted to four- or five-year-old children, believes

42

1    society should be more accepting of this, that's unfortunately

2    an attitude and a philosophy that's not solely Mr. Propst's.

3    And I think that expresses -- and I credit that description, I

4    think that expresses an attitude that is reflected in these

5    offenses.

6          So I think that the character is poor.  I think this,

7    looking at the offenses themselves rather than alleged offenses,

8    tells me enough about the seriousness of this offense and the

9    character of the defendant to conclude that a substantial prison

10   sentence is appropriate.

11         And it is -- it is difficult to predict the future.

12   And I don't think a sentence is supposed to predict the future.

13   It is -- certainly considers the danger of the defendant to

14   others, but it has to be proportional to the offense that the

15   defendant committed.  I've said in another context that it's --

16   defendant should be sentenced for what he did, not for what a

17   judge fears he might do at some later time in some other place.

18   We don't have the kind of knowledge.

19         And I think it's -- while I certainly -- while the

20   history here and the character indicate the need for a

21   significant sentence and something on the higher end of the

22   range that would be proportional and just, I'm satisfied that

23   that prediction can't be the basis of the Court's sentence or

24   the sense that he's perhaps as likely to engage in such behavior

25   again.

43

1          And despite my finding of less than credible

2   statements of remorse given his circumstances and opportunistic

3   manner in which these arise while facing sentencing, I don't

4   want to suggest that Mr. Propst is incapable of changing nor

5   that he wants to change.  He certainly has that ability.  He's a

6   human being.  Every human being has the freedom to commit other

7   crimes or not, to use drugs or not.  And that's up to Mr. Propst

8   ultimately once he serves his sentence.

9          Considering all these things together, though, I'm

10  satisfied that a sentence within the range argued by counsel is

11  appropriate and I'm going to impose a sentence that will total

12  84 months.  I'm going to impose 36 months on Counts 1 and 3 to

13  be served consecutive, and an additional 12 months on Count 4

14  which will be consecutive.  So that's a total of 7 years or 84

15  months.  I'm also going to impose 3 years of supervised release

16  which I understand to be the maximum.

17         During that period of supervised release, Mr. Phillip

18  is right, Mr. Propst will be supervised.  Should he violate

19  conditions of supervision, the public will be protected in the

20  sense that we will find out quickly and he will be brought back

21  to this court where he can be returned to prison and supervision

22  extended afterwards.

23         In arriving at this sentence, I've looked at not just

24  the single offense or the impact it would have on one person,

25  but I've considered the impact it's had on all of the people

1    that are within this relevant conduct.  And I think were one or

2    two of these before me I think we'd be looking at a significant

3    sentence, but to have this many after a history as indicated

4    here, I think the sentence should reflect the terror that the

5    defendant inflicted knowingly on families and those that

6    received these phone calls, the daycare centers.

7            So that's my rationale.  And I believe that it

8    warrants these types of sentences for what would otherwise and

9    would more commonly when they come to a federal court are

10   nowhere near as serious as these, but the manner in which the

11   defendant committed these crimes I think warrant a sentence

12   significantly over what the guidelines would otherwise

13   recommend.

14           Mr. Phillip, if I recall correctly there is not an

15   objection to the conditions set forth or the recommended

16   conditions of supervision?  Do you wish me to -- does your

17   client wish me to go through them one by one as part of the

18   pronouncement of sentencing here?

19           MR. PHILLIP:  Just one moment.  I'll ask Mr. Propst.

20           THE COURT:  I also want -- the judgment will reflect

21   the Court's recommendation for alcohol and drug abuse treatment

22   as well as sex offender treatment.  I note that the defendant

23   was offered treatment when he was last in federal prison at the

24   federal correctional center at Butner and did not take advantage

25   of it or --

1          MR. PHILLIP:  As to the conditions, Your Honor, I'm

2    just looking for the number.

3          Condition No. 2.  Must not leave the state or the

4    district without the permission of the court or probation

5    office.

6          It may be that if Mr. Propst gains employment again as

7    a truck driver that that condition is either going to be -- I

8    don't want to call it problematic, but it may take some

9    management by the probation office.  And so I don't know that

10   that's necessarily an objection, but it's the premonition about

11   he may have to ask to leave the state if he's employed as a

12   truck driver.

13         I discussed briefly with Mr. Propst -- well, let me

14   step back.  We discussed the conditions of supervision when we

15   received the presentence report, and then I asked him just now

16   and he said that he does not object to the Court adopting the

17   conditions and the rationale that the Court does not have to

18   read each one out loud.  But, again, I'm making that comment

19   about the condition of staying within the district.

20         THE COURT:  And we certainly see that in other cases.

21   At least at this stage and upon release, I think 2 makes sense.

22   It's necessary to be able to supervise to know where a person

23   is, and if he leaves the state we don't.

24         In the event that a job as a truck driver becomes

25   available, we can certainly modify the conditions.  I can invest

1    -- or the agent does have the authority to approve and certainly

2    for employment-related purposes, for legitimate employment that

3    would make sense.  But just the possibility of getting a

4    truck-driving job at this point doesn't warrant not having that

5    in there.  It can be modified later if circumstances warrant.

6           There's no objection and no -- no objection to my not

7    pronouncing them, each condition as a part of the sentence then,

8    I will adopt the conditions as my -- as stated in the

9    presentence report and the rationale stated therein.  The types

10   of conditions we impose on cases like this include:  Close

11   monitoring and drug and alcohol testing and treatment, random

12   testing so that if he's back on drugs we'll know, as well as sex

13   offender treatment.  And that will be followed up on.

14          I did want to point out paragraph 115 describes the

15   opportunity he was placed in sex offender treatment while housed

16   at FCI Butner back in his earlier federal sentence, did not

17   complete that program, had multiple arguments with participants

18   which resulted in him being removed from the class.

19          And so I'm satisfied that treatment is appropriate,

20   but so far it has not, I don't think, met with the type of

21   attitude one would expect and hopefully now it will be.

22          MR. PHILLIP:  Your Honor, Mr. Propst pointed out one

23   further thing that I forgot.  I thank him for doing that.

24          Condition No. 12.  I'd ask that it be simply modified

25   to refrain from the use of excessive -- or refrain from the

1    excessive use of alcoholic beverages.

2          THE COURT:  Okay.  That modification will also be

3    adopted, excessive use.  And by "excessive use" I think a

4    condition should indicate drinking to intoxication with a blood

5    alcohol content in excess of .1.

6          MR. PHILLIP:  Thank you.

7          THE COURT:  That should provide the specification.

8          I also say if the drug abuse counselor recommends that

9    there be complete absence or a complete removal of alcohol, I

10    would adopt that as well.  But I don't have a basis for saying

11    that at this point on this record.

12          Anything else other than appeal rights?

13          MR. HUMBLE:  Not from the government.

14          THE COURT:  Was there a request for Oxford or --

15          MR. PHILLIP:  Yes.

16          THE COURT:  -- a facility as close to -- the judgment

17    will include a recommendation for a placement as close to his

18    home as possible, with the understanding that the need to

19    provide treatment recommended outweighs that.

20          All right, Mr. Propst.  You have the right to appeal

21    your conviction or your sentence.  Your attorney will talk to

22    you about possible grounds to appeal.  If you cannot afford the

23    costs of an appeal, the clerk will assist you so you can file in

24    forma pauperis and not have to pay those costs.  If you choose

25    to appeal, you have to file a notice of appeal within 14 days of

1     the entry of the judgment.  If you fail to file a timely notice

2     of appeal, you would lose your right to appeal.  Do you

3     understand those things?

4            THE DEFENDANT:  Yes.

5            THE COURT:  Anything else?

6            MR. HUMBLE:  Other charges dismissed, Your Honor.

7            THE COURT:  Other charges are dismissed.

8            MR. HUMBLE:  I don't know if you mentioned special

9     assessment or not.  I'm sorry.

10           THE COURT:  The special assessment has to be imposed

11    as well, and that's a hundred dollars for each count for a total

12    of $300.  Thank you, Mr. Humble.

13          Okay.  This matter is concluded.

14          MR. HUMBLE:  Thank you.

15          (Hearing concluded at 2:45 p.m.)

16                 *    *    *

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.

Signed and Certified August 9, 2019.

<u>/s/John T. Schindhelm</u>

John T. Schindhelm

John T. Schindhelm, RPR, RMR, CRR<br>
United States Official Reporter<br>
517 E Wisconsin Ave., Rm 236,<br>
Milwaukee, WI 53202<br>
Website: WWW.JOHNSCHINDHELM.COM

50